IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

RONALD E. HALL )
 )
v. ) No. 3:12-1173
 ) Judge Nixon/Bryant
SOCIAL SECURITY ADMINISTRATION )

To:   The Honorable John T. Nixon, Senior Judge

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. §§ 405(g) and 1383(c), to obtain judicial review of the final decision of the Social Security Administration ("SSA" or "the Administration") denying plaintiff's application for supplemental security income benefits, as provided under the Social Security Act. The case is currently pending on plaintiff's motion for judgment on the administrative record (Docket Entry No. 12), to which defendant has responded (Docket Entry No. 13). Plaintiff has further filed a reply brief in support of her motion (Docket Entry No. 16) and defendant has filed a sur-reply (Docket Entry No. 19). Upon consideration of these papers and the transcript of the administrative record (Docket Entry No. 10),[1] and for the reasons given below, the undersigned recommends that plaintiff's motion for judgment be DENIED and that the decision of the SSA be AFFIRMED.

---

[1] Referenced hereinafter by page number(s) following the abbreviation "Tr."

## I. Introduction

Plaintiff filed his application for benefits on March 18, 2009. (Tr. 8, 115-17) That application was denied at the initial and reconsideration stages of agency review, whereupon plaintiff requested *de novo* consideration of his claim by an Administrative Law Judge (ALJ). On June 21, 2011, plaintiff appeared, with counsel, and testified at a hearing before the ALJ. (Tr. 23-51) At the conclusion of the hearing, the ALJ took the matter under advisement, until June 30, 2011, when he issued a written decision in which plaintiff was found not disabled. (Tr. 8-17) That decision contains the following enumerated findings:

1. The claimant has not engaged in substantial gainful activity since March 18, 2009, the application date (20 CFR 416.971 *et seq.*).

2. The claimant has the following severe impairments: lumbar degenerative disc disease, hepatitis C viral infection, and hypertension (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) including lifting and/or carrying 20 pounds occasionally and 10 pounds frequently, sitting a total of six hours, as well as standing and/or walking a total of six hours each over the course of an eight-hour workday; except he can never climb ladders, ropes or scaffolds, and he can only occasionally stoop, crouch, kneel, crawl, balance, or climb stairs or ramps.

5. The claimant is capable of performing past relevant work as a property clerk. This work does not require the performance of work related activities precluded by the claimant's residual functional capacity (20 CFR 416.965).

6. The claimant has not been under a disability, as defined in the Social Security Act, since March 18, 2009, the date the application was filed (20 CFR 416.920(f)).

(Tr. 10, 12, 16-17)

On September 13, 2012, the Appeals Council denied plaintiff's request for review of the ALJ's decision (Tr. 1-4), thereby rendering that decision the final decision of the Administration. This civil action was thereafter timely filed, and the court has jurisdiction. 42 U.S.C. §§ 405(g), 1383(c). If the ALJ's findings are supported by substantial evidence, based on the record as a whole, then those findings are conclusive. Id.

## II. Review of the Record

The following record review is taken from defendant's brief, Docket Entry No. 13 at 2-11:

*Medical Evidence*

From the disability application date on March 18, 2009, Veterans Affairs (VA) facility records list the following prescribed medication: analgesic (Tramadol, 100 mg per day as needed); diuretic (hydrochlorothiazide, 25 mg); aspirin (81 mg); calcium channel blocker (Amlodipine, 5 mg); antacid (ranitidine, 150 mg twice daily); and artificial tears. Tr. 410-412.

Next, on June 14, 2009, Dr. Bruce Davis examined plaintiff for the agency. He noted the medical history of hypertension (treated with medication); hepatitis B and C (not being treated), gastrointestinal symptoms (treated with medication); degenerative arthritis pain (conservatively treated); and situational anxiety or depression, sleep difficulties. Tr. 365. Plaintiff described headaches, shortness of breath, cough, and kidney stones. Social habits included walking. Dr. Davis's clinical exam was essentially normal (*e.g.,* speech, vision, heart, lungs, abdomen, neurologic) except for blood pressure (140/88) and body mass index (BMI) (30). Dr. Davis found all plaintiff's extremities had full motion, but the shoulder moved

slowly due to pain and low back pain slowed position change. Plaintiff had straight leg raising to 80 degrees and crepitus (crackling sound) in the knees with tenderness on normal bending and 130 degrees straightening. Plaintiff could not completely squat. He also had a slow, painful, unsteady gait, while crossing the exam room without assistance. Dr. Davis assessed obesity based on the BMI, hypertension, hepatitis B and C, degenerative arthritis (shoulder, back, knee), and situational anxiety or depression with sleep difficulty. He opined plaintiff could do light work that required no more than limited bending or squatting and required no climbing of heights or exposure to heat, humidity, or liver damaging chemicals. Tr. 365-67.

In July 2009, Disability Determination Services (DDS) Dr. Misra opined the evidence indicated plaintiff could do light work with occasional postural movements but not climb (ladders, ropes, or scaffolds) or work around hazards (heights). Tr. 369-77.

On October 2, 2009, gastroenterologist Dr. Williams saw plaintiff for abdominal pain. Dr. Williams noted the medical history of hepatitis from 2002 and irritable bowel syndrome (IBS). Plaintiff described constant weakness, malaise, and nausea. Screening indicated no weight loss or any incapacitating episodes for the past twelve months. Plaintiff was not being treated for hepatitis C that may have been contracted from blood exposure during prior military service or intranasal cocaine use. Upon exam, Dr. Williams found no abdominal abnormality, portal hypertension, or sign of liver disease. Blood tests were essentially normal. Noting that a previous abdominal ultrasound for similar complaints had been normal, Dr. Williams diagnosed hepatitis C as the cause of stomach pain along with IBS and prescribed no treatment. He opined the stomach pain would mildly limit plaintiff's ability to do chores, shop, and travel and moderately limit exercise, participate in sports, and

4

recreation. Tr. 479-86, 416-19, 422.

On October 27, 2009, psychologist Dr. Pettigrew evaluated plaintiff who thought he was disabled by hepatitis C and back pain, noting felony convictions and a prison history made it harder to find work. He had had no mental health treatment but trouble sleeping and lacked a good appetite. He denied drinking excessively or using illegal drugs recently. Dr. Pettigrew saw minimal eye contact and mildly restricted affect. Plaintiff was well-groomed and walked without pain or abnormality of gait, balance, or gross motor coordination. Dr. Pettigrew saw no signs of distress, pain, or anxiety. Alert and calm, plaintiff spoke normally, correctly solved math problems, lacked violent or delusional ideation, and showed average intelligence and adequate immediate memory. He lived with friends and, after noting he occasionally did odd jobs, challenged Dr. Pettigrew, saying he did not want to keep a friend waiting. Dr. Pettigrew diagnosed no mental impairment but noted possible alcohol or substance abuse, or dependence, and antisocial personality disorder traits. He opined of average intelligence; ability to understand, remember, and carried out simple verbal instructions; and no evidenced cognitive deficiencies (*e.g.,* attention, concentration, memory). He concluded plaintiff's mental health unremarkable while being "quite evasive." Tr. 392-96.

In November 2009, DDS Dr. Davis opined the record indicated no severe mental impairment and either mild or no functional limitations. Tr. 378-91. In December 2009, DDS Dr. Pennington opined the record indicated plaintiff could do light work with occasional postural movements and no climbing (ladders, ropes, scaffolds). Tr. 397-402.

On March 1, 2010, plaintiff requested a mental health evaluation at a VA emergency room (ER). Nurse Clan noted a history of benign hypertension on finding blood

5

pressure measuring 198/135 and 201/135. Plaintiff described level-eight pain (scale of ten). Tr. 476-77. Nurse Hoefler found plaintiff pleasant, calm, and appropriate. After updating some records, he said he had a dental appointment and hoped he could get the mental health evaluation. Tr. 475-76. Later, psychiatrist Dr. Campbell noted the history before March 2009 of questionable cocaine use, transient ischemic attacks (TIA), hepatitis C, and chronic back pain. Plaintiff had lived with friends for two years, sometimes grilled food for money, and had received bodies for transport to the morgue during military service. He was not in combat. For a month, he had insomnia and nightmares after televised coverage of the Haiti earthquake. He had no history of physical or sexual trauma. Dr. Campbell found no signs of hyper-vigilance, hyper-arousal, avoidance, major depression, or psychosis. Plaintiff was well-groomed, calm, polite, and interactive with appropriate eye contact, normal speech, psychomotor signs, and thinking. Affect was full. Insight and judgment were fair. Dr. Campbell assessed unspecified anxiety disorder and borderline moderately limiting symptomatology (GAF 60). Due to the uncertain diagnosis, he prescribed no treatment. He noted possible cocaine abuse or dependence, hormonal disorder, or post-traumatic stress disorder (PTSD). He planned urine drug screening and a possible substance abuse clinic referral. He described emergency support services. Plaintiff missed a mental health treatment appointment arranged for him in mid-March. Tr. 471-77.

  On July 14, 2010, plaintiff returned to the ER for mental health treatment of nightmares. Blood pressure was 192/136, BMI was 28, and pain was eight (scale of 10). He described a three-day headache probably due to hypertension and right upper quadrant pain with an instance of diarrhea. Dr. Szot found no vision change, weakness, paresthesia, gait abnormality, nausea, or chest pain. His clinical exam was essentially normal but the right

upper quadrant was tender to palpation and bowel sounds were increased. Dr. Szot assessed abdominal pain, headache, and current hypertension. He treated only hypertension, with 10 mg hydralazine. Minutes later, blood pressure was 150/104 and the headache was gone. Tr. 463-64, 467-69, 471. Dr. Campbell noted restricted affect, dysphoria, and apparent irritability. Plaintiff was mainly cooperative and interactive. He had no psychomotor or thought abnormalities. Insight and judgment were fair. He was using cocaine to numb tooth pain. Dr. Campbell diagnosed unspecified anxiety disorder. He noted possible cocaine abuse, hormonal disorder, or PTSD. He prescribed no treatment and gauged moderately limiting symptoms (GAF 55). He planned tests, possible substance abuse clinic referral, and an initial mental health evaluation referral. Tr. 464-67. Lab tests were essentially normal except for cocaine. Tr. 410, 416-21, 424, 461-63, 454-55.

On July 28, 2010, VA psychiatrist Dr. Savage evaluated plaintiff. He noted in the medical history, TIA treated with 325 mg aspirin. He thought plaintiff a semi-reliable historian. *E.g.,* bad dreams since 1987 and more frequently after the earthquake. Plaintiff described being startled by passing sirens and hyper-vigilant on going new places. With recent insomnia he sometimes felt depressed, lacking normal interest, energy, and hope. He denied seizures, violence, self-mutilation, homicidal or suicidal ideation, and psychotic or manic symptoms. He lived with a family friend. Upon exam, Dr. Savage found poor to fair hygiene, good cooperation, and some irritability at waiting. Plaintiff was alert and oriented, spoke normally, and had normal associations, thought processes, thought content, perception, and knowledge. Attention and concentration were fair, judgment was impaired, and insight was poor. He denied cocaine use or excessive use of alcohol. When asked about the positive cocaine test from July 14, 2010, he said he used cocaine for tooth pain and

became very irritated. Dr. Savage found memory good and intact, mood "OK" but constricted. He assessed unspecified anxiety disorder and unspecified depressive disorder. He noted possible cocaine abuse or dependence, hormonal or metabolic disorder, and PTSD. He assessed moderately limiting symptoms (GAF 51-60). His treatment plan was: reassurance, urging compliance with hypertension and pain medications, social support of friends, and emergency support as needed. Dr. Propper concurred. Mirtazapine was prescribed for one month with instructions not to drink alcohol. Plaintiff's blood tested positive for cocaine use again. Tr. 410, 454, 457-63, 418-19, 421-22, 424.

On August 11, 2010, Dr. Savage gave therapy. Plaintiff slept better on Mirtazapine (up to six hours) but had nightmares. Dr. Savage discouraged watching news before bed. Plaintiff agreed he usually did not have nightmares when with friends before bed. He denied cocaine and alcohol use. Clinical exam showed poor to fair hygiene, fair eye contact, and good cooperation except when discussing cocaine use. Plaintiff was alert and oriented and had normal speech, associations, and thinking. Immediate recall and recent memory were full, and long term memory was intact. Judgment was impaired, insight was poor, and attention and concentration were fair. Dr. Savage thought plaintiff might be malingering. Treatment was reassurance; increased Mirtazapine; Vitamin D and folic acid; urging better compliance with hypertension medication; social support of friends; and emergency support as needed. Tr. 452-56, 408-10.

On August 30, 2010, plaintiff responded positively to all PTSD screening. He described constant low back pain (seven, scale of ten) that limited activity and concentration. Nurse Rosales recommended weight management and flu shot. After not taking hypertension medication for a while, plaintiff reported no symptoms, *e.g.,* eyes, ears, nerves,

8

skin. Dr. Finney's exam was normal except blood pressure was 188/98 and BMI was 29.6. She found no lumbar back abnormality or pain; good judgment; good insight; and good recent and remote memory. Dr. Finney assessed hypertension under poor control due to non-compliance along with stable hepatitis C, low back pain, and anxiety. She adjusted hypertension medication and ordered blood pressure rechecked on departure. Given the PTSD screening, Dr. Finney provided emergency contacts but deferred to ongoing treatment. Nurse Cone noted prescriptions for aspirin, vitamin D, folic acid, and Mirtazapine with hypertension medications pending(hydrochlorothiazide, Lisinopril). On departure, blood pressure was 160/100. Tr. 442-52, 406-09.

On September 15, 2010, plaintiff saw Dr. Savage for therapy and medication management. He had stopped taking Mirtazapine due to constipation and now had more insomnia (four hours a night) and nightmares. He tried to avoid news before bed. He was taking hypertension medications and vitamin supplements as prescribed. He was ambiguous about cocaine and Tramadol use, noting he sometimes used Tramadol but could not recall how he got the drug. Dr. Savage found a stable mood and no signs of major depression, delusions, or medication side effects. He also found fair hygiene, grooming, and eye contact. Plaintiff was cooperative but irritable about questions on cocaine or alcohol use. When asked about positive cocaine tests, he said he might have used it for tooth pain in August 2010. He continued to use alcohol against medical advice. Judgment was impaired and insight was poor to fair. Mood was "OK" and constricted. Memory was grossly intact. Attention and concentration were fair. Tr. 439-440. Dr. Savage again indicated possible malingering. GAF remained 51-60. Dr. Savage replaced Mirtzapine with a low dose of Trazodone, 50 mg, for insomnia. Otherwise, the treatment plan was unchanged. Dr. Propper concurred. Tr. 438-

9

42, 406, 409, 415-19, 421-23.

In October 2010, Nurse Cook found high blood pressure (194/122, 186/120, 166/118) but plaintiff would not remain for treatment. He felt normal; *i.e.,* no blurry vision, chest pain, headache. Dr. Finney adjusted medication. He did not respond to follow-ups. Tr. 436-38, 406.

On February 3, 2011, plaintiff sought a PTSD clinic referral for nightmares and night sweats. He had low back pain (seven, scale of ten) and occasional, slight right chest pain. He was taking a half-dose of prescribed hypertension medication. He denied chest pain, dizziness, or headache. Blood pressure was 183/121 and 160/78. BMI was 28. Dr. Finney's exam was normal, including no distress, lumbar tenderness to palpation, or mental abnormality. She found good judgment, insight, and memory. She diagnosed hypertension, stable herniated lumbar disk, stable hepatitis C, and PTSD. She encouraged medication compliance and referred plaintiff to a PTSD clinic but cancelled it soon afterward. Tr. 431-36, 405-07, 413, 426-27.

*Other evidence*

In April 2009, plaintiff explained he was disabled by hypertension, hepatitis C, spinal impairment, and arthritis (knee, shoulder). He took medications for hypertension, back pain, and digestion that made him drowsy, weak, and nauseous. He had worked in a Department of Defense (DoD) warehouse, in utility work, as a lab technician, and as a youth counselor. Tr. 128-142. He did not evidence limitations of reading, understanding, and concentrating. Tr. 126. In July 2009, a vocational consultant said the lab technician work was light work. Tr. 143-44.

In September 2009, plaintiff reported that since July 2009, he had trouble

10

sleeping, less appetite, daily back and stomach pain, inability to concentrate due to depression, trouble sitting, blurry vision, and constant tiredness. He had not sought treatment for these conditions. He took his medications. His conditions caused poor hygiene and trouble tying shoes. He no longer visited others, cooked, or walked for exercise. Tr. 147-53. He lived with friends and spent his days eating, bathing, doing a few exercises, watching television, at the public library, visiting friends and family, and helping his mother a little. His conditions limited walking and, sometimes, thinking clearly. He did not sleep well or shower a lot. He kept his hair cut, shaved a few times a week, ate twice a day unless nauseated, and infrequently eliminated. Due to tiredness, he needed reminders to take medication and keep appointments. He did some light house and yard chores if motivated. He went out for fresh air daily and walked, used public transport, or rode in a car. He shopped for food monthly. His conditions did not affect his ability to pay bills, count change, handle a savings account, use a checkbook, and use money orders. He enjoyed watching television, a bit of reading, and fishing but got headaches. Socially, he conversed, watched sports, and used the public library computer a few times a week. He regularly visited his mother. Yet his conditions made him want to be alone. He could lift 20 pounds and sit two hours. Sometimes he could not think, tie shoes, reach with the left arm, or remember what he had eaten. His attention span was variable. He finished conversations and chores and could follow written and spoken instructions pretty well. He got along well with authority figures and was never laid off for not getting along with others. He did not handle changes in routine very well. He wore eyeglasses and used a back brace as needed. Tr. 154-61. His back pain lasted a few hours or a few days, and spread to his legs three times a week after standing or sitting too long or rolling over while sleeping. Sometimes it was stabbing and hard to bear

and made his legs numb. Medication relieved pain for about six hours but caused nausea, drowsiness, constipation, and dizziness. He also used a heating pad. Tr. 162-63.

In December 2009, plaintiff reported that since November 2009 blood pressure no longer responded to medication; nausea and diarrhea; and worse back pain, insomnia, and appetite. He also had a stiff shoulder and wrist, difficulty thinking, bad headaches, and nosebleeds. He had not sought treatment for these problems. He took prescribed medications. He mostly watched television or went to the library. Tr. 166-71.

At the ALJ hearing in June 2011, plaintiff testified he did not take illegal drugs. Tr. 28. He took prescription drugs as prescribed. Tr. 28. He had worked for DoD tagging equipment brought in for repair, sending it out for repair, and so on. Tr. 30. He could no longer work due to lower back pain, hepatitis, arthritis (left shoulder and knee), and IBS. Tr. 33-36. Back pain was the worst problem and it caused trouble sleeping. He no longer had physical therapy and considered the exercises unhelpful. He took pain medication only when needed, *e.g.,* ibuprofen, Tramadol. Tr. 33-34. Regarding hepatitis, he was always tired and had no energy. There was no treatment for it. Tr. 34. Regarding the knee and shoulder, the left knee "locked up" periodically and he took aspirin for it. Tr. 34-35. For IBS, he took medication that did not work and he had to use the bathroom a lot. Tr. 35-36.

His attorney elicited additional testimony: Back pain radiating to both legs made them so swollen, he had to elevate them daily for an hour. He also used a brace and a heating pad. IBS cause him to use the bathroom four times. He slept only four hours a night, so he needed to sleep during the day. PTSD and depression limited concentration and memory. He could sit two hours, stand one hour, walk 30 minutes, and lift 15 pounds. Pain kept him from kneeling and retrieving things from the floor. He was five feet, eight inches

12

tall and weighed 190 pounds. His back pain had been disabling for about eight years. He did not go out much. He went to the grocery once a month but could not stand in line. He no longer went fishing, to the library, or used a computer. He only checked on his mother. He microwaved meals. Mostly, he went out for medical treatment, groceries, or to see relatives. He had mini-strokes, most recently last week, but could not recall what happened. Tr. 37-38, 40-44.

Plaintiff added PTSD and bad dreams were due to military service, although he was not in combat. As a medical lab tech, he dealt with autopsies, casualties, signing for body parts, and the like, whenever casualties occurred during military training in Hawaii. Tr. 38-40. He could only sit two hours due to back pain, and then he needed to stand up and stretch. Regarding mini strokes, he took his prescribed hypertension medication every day. Hypertension sometimes gave him nosebleeds and severe headaches. Tr. 44.

[Vocational Expert] Neel testified, *inter alia,* plaintiff's DoD job was like that of a property clerk. Although plaintiff said he performed it as medium work, VE Neel said property clerk jobs are generally performed as light work. Tr. 48.

### III. Conclusions of Law

#### A. Standard of Review

This court reviews the final decision of the SSA to determine whether that agency's findings of fact are supported by substantial evidence in the record and whether the correct legal standards were applied. Elam ex rel. Golay v. Comm'r of Soc. Sec., 348 F.3d 124, 125 (6th Cir. 2003). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion.'" Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th Cir. 2007)(quoting Cutlip v. Sec'y of Health & Human Servs., 25 F.3d 284, 286 (6th Cir. 1994)). Even if the evidence could also support a different conclusion, the SSA's decision must stand if substantial evidence supports the conclusion reached. Her v. Comm'r of Soc. Sec., 203 F.3d 388, 389 (6th Cir. 1999).

B. Proceedings at the Administrative Level

The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." Id. at § 423(d)(3). In proceedings before the SSA, the claimant's case is considered under a five-step sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

> 1) A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.
>
> 2) A claimant who does not have a severe impairment will not be found to be disabled.
>
> 3) A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations. Claimants with lesser impairments proceed to step four.
>
> 4) A claimant who can perform work that he has done in the past will not be found to be disabled.
>
> 5) If a claimant cannot perform his past work, other factors including age,

education, past work experience and residual functional capacity must be
considered to determine if other work can be performed.

Cruse v. Comm'r of Soc. Sec., 502 F.3d 532, 539 (6th Cir. 2007)(citing, e.g., Combs v. Comm'r of Soc. Sec., 459 F.3d 640, 642-43 (6th Cir. 2006)(en banc)); 20 C.F.R. §§ 404.1520(b)-(f), 416.920 (b)-(f).

The SSA's burden at the fifth step of the evaluation process can be carried by relying on the medical-vocational guidelines, otherwise known as "the grids," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. See Wright v. Massanari, 321 F.3d 611, 615-16 (6th Cir. 2003). Otherwise, the grids cannot be used to direct a conclusion, but only as a guide to the disability determination. Id.; see also Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990). In such cases where the grids do not direct a conclusion as to the claimant's disability, the SSA must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert ("VE") testimony. See Wright, 321 F.3d at 616 (quoting Soc. Sec. Rul. 83-12, 1983 WL 31253, *4 (S.S.A.)); see also Varley v. Sec'y of Health & Human Servs., 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity ("RFC") for purposes of the analysis required at steps four and five above, the SSA is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. See 42 U.S.C. §§ 423(d)(2)(B), (5)(B); Foster v. Bowen, 853 F.2d 483, 490 (6th Cir. 1988).

C. Plaintiff's Statement of Errors

Plaintiff first argues that the ALJ erred in failing to consider all of his severe impairments. The impairments which plaintiff alleges were not given due attention are his obesity, transient ischemic attacks (TIAs), hypertension, retinopathy, posttraumatic stress syndrome with recurring nightmares, and his likely irritable bowel syndrome. It must first be noted that the ALJ gave explicit attention in his decision to all of these allegedly severe impairments save obesity. Analyzing plaintiff's cardiovascular complaints at the second, third, and fourth steps of the sequential evaluation process, the ALJ found plaintiff's hypertension to be medically severe but not so severe that it had resulted in end organ damage; further found that such hypertension could be better controlled with plaintiff's cooperation in treatment (Tr. 10, 16); and, otherwise explained why plaintiff's alleged TIAs (or "mini-strokes") and hypertensive retinopathy had not been sufficiently demonstrated to significantly affect his ability to work. (Tr. 14, 16) The ALJ addressed plaintiff's posttraumatic stress symptoms and recurring nightmares at the second step of the process, finding that the limited treatment and lack of significant symptoms other than nightmares, as well as the lack of compelling medical opinion evidence on the severity of this impairment, counseled against a finding that it affected plaintiff's ability to work. (Tr. 10-11) As to plaintiff's likely irritable bowel syndrome, that condition was noted by plaintiff's physicians and by the ALJ as sharing symptoms with plaintiff's hepatitis C. However, as noted in the medical record and by the ALJ, plaintiff's intermittent abdominal pain and diarrhea are not documented as occurring with a frequency or intensity that would suggest work-related limitations, and plaintiff consistently refused to undergo a colonoscopy and otherwise refused treatment for his hepatitis, thus justifying the ALJ's conclusion that these symptoms are not particularly limiting. (Tr. 14, 16)

With regard to plaintiff's alleged obesity, the record does not support that diagnosis. As described in the relevant Social Security Ruling,

> For adults, both men and women, the Clinical Guidelines describe a BMI of 25-29.9 as "overweight" and a BMI of 30.0 or above as "obesity."
>
> The Clinical Guidelines recognize three levels of obesity. Level I includes BMIs of 30.0-34.9. Level II includes BMIs of 35.0-39.9. Level III, termed "extreme" obesity and representing the greatest risk for developing obesity-related impairments, includes BMIs greater than or equal to 40. These levels describe the extent of obesity, but they do not correlate with any specific degree of functional loss.

Soc. Sec. Rul. 02-1p, "Titles II and XVI: Evaluation of Obesity," 2002 WL 34686281, at *2 (S.S.A. Sept. 12, 2002). In this case, plaintiff was consistently assessed with a BMI (Body Mass Index) of less than 30.0 (Tr. 413-14, 433, 445, 450, 470); the outlier in the record is Dr. Davis' diagnosis of Class 1 Obesity based on plaintiff's measured height of 5'6" and weight of 191 pounds. (Tr. 366-67) However, plaintiff was elsewhere consistently reported as 5'8" tall, as pointed out by defendant. (Tr. 413, 414, 433, 445, 470, 476) While plaintiff appears to hover on the borderline between the "overweight" and "obese" classifications, the ALJ properly declined to identify obesity as a severe impairment or to otherwise address plaintiff's body habitus beyond considering the limitations assessed by the medical sources of record, who may be presumed to have considered such in rendering their assessments.

Plaintiff next argues that the ALJ erred in failing to apply the Medical-Vocational Guidelines to direct a finding of disability. However, inasmuch as the ALJ decided the case at the fourth step of the sequential evaluation process by finding that plaintiff could return to his past relevant work, this alleged step five error is inapposite.

Plaintiff's remaining arguments, in essence, are that the ALJ improperly minimized the severity of his physical impairments and improperly discounted his credibility, resulting in an RFC finding that is inconsistent with the weight of the evidence. In particular, plaintiff contends that the evidence of his degenerative disc disease and resulting symptoms and limitations, as well as the fatigue he feels stemming from his hepatitis, deserved more weight in the analysis, due in part to his testimony that these symptoms and limitations were of disabling severity. However, it is the province of the ALJ to weigh the evidence, and this Court may not re-weigh it upon judicial review. Bradley v. Sec'y of Health & Human Servs., 862 F.2d 1224, 1227 (6th Cir. 1988) (citing Myers v. Richardson, 471 F.2d 1265, 1267-68 (6th Cir. 1972)). Rather, it is the role of this Court to determine whether the decision explaining the weighing of the evidence finds substantial support in the record and is consistent with the governing law. Myers, 471 F.2d at 1267. In this case, the ALJ's finding of plaintiff's RFC, informed by his finding of plaintiff's credibility, is consistent with the medical assessments (following two separate examinations) of consultative examiner Dr. Davis (Tr. 176-78, 365-67) and those of the nonexamining state agency consultants (Tr. 369-77, 397-402), and there is no treating source opinion to the contrary. Moreover, the ALJ fully explained his reasons for finding plaintiff's subjective complaints not fully credible, including by reference to plaintiff's lack of commitment to, and even outright refusal of, medical treatment. (Tr. 16) That rationale need not be repeated here.

In sum, the undersigned finds substantial evidence supporting the ALJ's findings as to plaintiff's limited RFC, credibility, and ability to return to his past relevant work. The decision that he is not disabled should therefore be affirmed.

## IV. Recommendation

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment on the administrative record be **DENIED**, and that the decision of the SSA be **AFFIRMED**.

Any party has fourteen (14) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have fourteen (14) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. Thomas v. Arn, 474 U.S. 140 (1985); Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

**ENTERED** this 11th day of May, 2015.

s/ John S. Bryant
JOHN S. BRYANT
UNITED STATES MAGISTRATE JUDGE